IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| United States of America, | CR 09-1706-TUC-DCB (GEE) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| vs. |  |
| CHRISTINA MARIE MORELAND, |  |
| Defendant. |  |

The District Court referred this case to the magistrate for hearing on pretrial motions. Hearing on the defendant's Motion to Suppress was held on February 9, 2010. Upon consideration of the evidence presented and the arguments of respective counsel, the magistrate recommends the District Court, after its de novo review, deny the Motion to Suppress.

**CHARGE:**

The two-count indictment charges that on July 14, 2009, the defendant conspired to possess, and did in fact possess, 84 kilograms of marijuana with the intent to distribute. It should be noted that a co-defendant was indicted along with Moreland; however, that co-defendant pleaded guilty and was sentenced on February 4, 2010.

1  **MOTION TO SUPPRESS:**

2   Defendant argues suppression is necessary because the stop of the vehicle she was driving
3  was not supported by reasonable suspicion.

4  *Testimony of Jose Vidales*

5   Vidales has been a Border Patrol agent since November, 2007. On July 14, 2008, he was
6  working the day shift, i.e., from 5 a.m. until 1 p.m., and was assigned traffic patrol duties in
7  the Benson area. He was alone in a marked vehicle-- a F-250 4x4 truck. At about 9 a.m. he
8  he was alone in his truck–parked in the median alongside I-10, between mile markers 315
9  and 316. He was facing north watching westbound traffic, and was located about 40-50
10 miles north of the border between the U.S. and Mexico. He testified he likes to patrol in that
11 area because, in his experience, there are a number of roads in the area that smugglers like
12 to use that lead from the border to I-10 which itself is a route favored by smugglers. He
13 further described his position as just west of Texas Canyon where I-10 slopes down from a
14 rise and "flattens out".

15  Vidales testified he saw three vehicles westbound "closely riding together"; the first was
16 a dark-colored Lincoln town car, followed by a dark-colored Dodge Stratus, and the third
17 was a SUV. They were traveling in tandem in the same lane with less that a car length
18 between each. He found it unusual given the time of day; it was about 9 or 9:15 a.m-- past
19 the time when most people who commute to Benson or Tucson would be traveling.
20 Furthermore, there were no other vehicles on the road before or after them. Vidales pulled
21 onto the highway and began to follow them "to take a closer look."Eventually, he caught up
22 and passed the last vehicle–the SUV. He noticed the driver of the Dodge reduced speed
23 "drastically" and was "not maintaining lane control." As he passed the Dodge he tried to
24 make eye contact with the driver or the passenger; both appeared nervous and would not look
25 in his direction. Vidales testified he also saw a burlap bundle "in the middle part of the
26 seating."Vidales testified he then passed the town car and pulled into the right lane. The
27 SUV pulled into the left lane, sped up, and passed Vidales. At some point later Vidales
28 checked and noticed the town car was no longer behind him. Vidales testified that he then

1 pulled off onto the frontage road and waited for the remaining two vehicles–the Dodge and
2 SUV-- to pass. He noticed the town car was no longer on the highway. As the Dodge passed
3 his location he noticed that the female driver and the passenger were "hunched down" and
4 Vidales testified he again saw the burlap bundle.

5 Vidales ran the license plate and learned it was registered out of Wilcox. He also stated
6 the Dodge appeared to be riding low in the back even though he could see no passengers in
7 the rear. Vidales was shown several photos (Exhibits 8, 9, and10) and although he identified
8 them as photos of the suspect Dodge, testified that the burlap bundle was not in the exact
9 same position as on July 14th; rather the bundle "was propped a little higher...about shoulder
10 length in the middle." The burlap was significant to him because in the 17 months he'd been
11 working as a BP agent burlap was always used to wrap the marijuana in each of the 7-8
12 seizures in which he has been involved. Vidales then initiated the stop of the Dodge by
13 turning on the emergency equipment. The driver pulled off the road, jumped from the
14 vehicle and began walking toward Vidales who told her to get back into the Dodge. Vidales
15 identified defendant Moreland as the driver of the Dodge. Marijuana was found in the
16 Dodge. It should be noted that when identifying photos of the marijuana found in the vehicle
17 Vidales explained that following a seizure it is the customary practice to remove the burlap
18 and wrap the bundles in cellophane for weighing.

19 On cross-examination Vidales stated he did not write the "probable cause statement" in
20 this case. However, on July 17, 2009, he did write a report about the incident He also
21 testified that although a report indicates he was driving a BP SUV when he stopped the
22 defendant, he was actually in a marked 4x4 truck. Vidales also testified he could not tell if
23 the three vehicles traveling in tandem were "going too fast or too slow." He further stated
24 that he knows of no other uses for burlap sacks except for wrapping marijuana bundles.
25 Vidales testified that when the three vehicles first passed him--when he was stationary and
26 facing north along I-10–he could not tell if any of the vehicles' occupants acknowledged him.
27 Vidales pulled westbound onto I-10 to continue his surveillance of the three vehicles near
28 mile post 316 and stopped the Dodge at mile post 295. Vidales did not look to see if there

were others in the backseat. He also testified he was not sure if the third vehicle in line was a SUV or a 4x4, and that he only saw one male in that vehicle who looked at him before speeding off.

*Testimony of Patrick DeJonghe*

DeJonghe is an accident reconstructionist with a private investigator's license issued by state of Arizona. He was hired by the defense. On January 8, 2010, DeJonge went out to the Texas Canyon area along I-10, stood in the median near milepost 316, and took photos (attached hereto as Exhibits L, M, N, and O) of the road as traffic approached from the east. DeJonghe stated he was primarily concerned with "what you could see and when you can see it. And understanding that at 75 [mph] you're traveling at 110 feet per second, so I was interested to see how far you could see somebody in a car or in a vehicle and how long a period of time you would have to make any observations....Then the other thing ... I noticed was the traffic pattern at the base of Texas Canyon as you're coming down off the hill and the curves and getting down to the base of Texas Canyon." DeJonghe testified that his first observation was that a person parked in the median "would have about 30 seconds to first see a vehicle and until it came by." His second observation was that "you have about one and a half seconds that you could possibly see [inside a vehicle and ascertain how many people were in the vehicle]."

On January 25, 2010, DeJonghe and defense counsel went to an impound lot in Bisbee to examine the defendant's vehicle at about 9 a.m. He took photos that day and they are attached hereto as Exhibits A through K. The import of those photos and his testimony is: the difficulty of seeing inside the stopped vehicle from just 10 feet in front, and from about 5-6 feet alongside; the vehicle's back and side windows are heavily tinted so that it is difficult to see inside when the windows are up; and even DeJoonghe's weight of 205 lbs. caused the vehicle's rear to lower only three-quarters of an inch. DeJonghe concluded that when vehicles are moving at 75 mph it would diminish the ability to make those observations Vidales claimed to have made.

1    On cross-examination DeJohghe admitted that the sun rises much later in January than in
2 July, so that even at the same time of day the sun's angle on the vehicle would not be the same
3 in January as in July, and that would modify or affect "what visibility is inside [the vehicle]."

*Rebuttal testimony of Vidales*

5    After reviewing defense Exhibits L, M, N and O, Vidales testified that on the day he
6 stopped the defendant his service vehicle was parked further west toward mile marker 315,
7 while the defense photos appear to have been taken from 100-200 feet further east of where
8 he(Vidales) had been parked on July 14, 2009. He also reviewed government's Exhibit 14
9 which is a photo of the Dodge Stratus with its rear seat folded down. Vidales testified that
10 although on July 14th the rear seat was folded down as pictured there were additional items in
11 the rear, e.g., a car seat, back pack, under and around the folded down rear seat, so that the rear
12 seat did not fold down as flat as is shown in Exhibit 14. This, in turn, caused the marijuana
13 bundles to ride higher. Vidales testified the marijuana bundles were "stacked double on top
14 of the [rear] seat" to a height of two to three feet.

## **DISCUSSION:**

17    Admittedly, at times the testimony of agent Vidales can best be described as torturous.
18 However, he stated the following reasons for deciding to stop the Dodge: it was between two
19 other vehicles and all three seemed to be traveling in tandem–they were traveling very close
20 together with no other vehicles before or after them; the two occupants of the Dodge did not
21 acknowledge him; the driver of the Dodge was driving somewhat erratically; he saw burlap
22 wrapped bundles in the Dodge and he associated that wrapping with marijuana; and the Dodge
23 appeared to be riding low in the rear. Vidales also stated the area is one favored by smugglers.
24 While the other factors by themselves do not establish reasonable suspicion, this court believes
25 that adding the agent's observation of the burlap bundles to the "totality of circumstances"
26 does support a finding that Vidales did have reasonable suspicion to stop the defendant's
27 vehicle. During the hearing there was, of course, much contention over what Vidales could
28 or could not have seen inside the Dodge on the morning of July 14, 2009. The photos and

- 5 -

1 testimony do establish that the burlap bundles were stacked in the Dodge in such a way that
2 an experienced officer might very well have seen them, and Vidales never wavered from his
3 testimony that before the stop he did see these bundles during his observations of the Dodge.

**RECOMMENDATION:**

In view of the foregoing, the magistrate recommends that the District Court, after its independent review of the record, **DENY** the Motion to Suppress. Either party may file objections within 14 days after being served with a copy of this Report and Recommendation. If objections are not timely filed, the party's right to de novo review may be waived. If objections are filed, the parties should direct them to the District Court **by omitting the magistrate's initials from the caption.**

This Report and Recommendation is being faxed to all counsel on today's date. The Clerk of the Court is directed to send a copy of this Report and Recommendation to all counsel.

DATED this 4th day of June, 2010.

*Glenda E. Edmonds*
Glenda E. Edmonds
United States Magistrate Judge